UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:16-CV-00090-HBB

**DONALD R. HALEY**                                                                                 **PLAINTIFF**

**VS.**

**NANCY A. BERRYHILL, Acting
Commissioner of Social Security**                                                        **DEFENDANT**

<u>**MEMORANDUM OPINION
AND ORDER**</u>

<u>BACKGROUND</u>

Before the Court is the complaint (DN 1) of Donald R. Haley ("Plaintiff") seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  Both the Plaintiff (DN 15) and Defendant (DN 18) have filed a Fact and Law Summary.

Pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties have consented to the undersigned United States Magistrate Judge conducting all further proceedings in this case, including issuance of a memorandum opinion and entry of judgment, with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed (DN 11).  By Order entered August 22, 2016 (DN 12), the parties were notified that oral arguments would not be held unless a written request therefor was filed and granted.  No such request was filed.

1

FINDINGS OF FACT

Plaintiff protectively filed an application for Supplemental Security Income benefits on May 13, 2014 (Tr. 51, 195). Plaintiff alleged that he became disabled on February 14, 2013, as a result of an enlarged heart, bad right leg, high blood pressure and depression (Tr. 51, 212). Administrative Law Judge Richard E. Guida ("ALJ") conducted a video hearing from Baltimore, Maryland, on May 18, 2015 (Tr. 51, 65-67). Plaintiff and his attorney, Richard Burchett, participated from a hearing room in Bowling Green, Kentucky (Tr. 51, 65-67). David Don couch also participated as a testifying vocational expert (Tr. 51, 65-67).

In a decision dated July 1, 2015, the ALJ evaluated this adult disability claim pursuant to the five-step sequential evaluation process promulgated by the Commissioner (Tr. 51-60). At the first step, the ALJ found Plaintiff has not engaged in substantial gainful activity since May 13, 2014 the alleged onset date (Tr. 55). At the second step, the ALJ determined that Plaintiff has the following "severe" impairments: "coronary artery disease, cardio myopathy, degenerative joint disease, and obesity" (Tr. 55). The ALJ also determined that Plaintiff's medically determinable medical impairments of depression and other affective disorders are "non-severe" impairments within the meaning of the regulations (Tr. 55-56). At the third step, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1 (Tr. 56).

At the fourth step, the ALJ found Plaintiff has the residual functional capacity to perform less than a full range of light work (Tr. 57). More specifically, the ALJ found:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can frequently stoop. He can occasionally climb ramps and stairs as well as occasionally Neil, crouch and crawl. He cannot use ladders, ropes

2

>  or scaffolds. He must avoid concentrated exposure to temperature extremes, vibrations, fumes, odors, and dusts, gases, poor ventilation and hazards.

(Tr. 57). Relying on testimony from the vocational expert, the ALJ found that Plaintiff is unable to perform any past relevant work (Tr. 59).

The ALJ proceeded to the fifth step where he considered Plaintiff's residual functional capacity, age, education, and past work experience as well as testimony from the vocational expert (Tr. 59-60). The ALJ found that Plaintiff is capable of performing a significant number of jobs that exist in the national economy (Tr. 59-60). Therefore, the ALJ concluded that Plaintiff has not been under a "disability," as defined in the Social Security Act, from May 13, 2014 through the date of the decision, July 1, 2015 (Tr. 60).

Plaintiff timely filed a request for the Appeals Council to review the ALJ's decision (Tr. 48). Additionally, Plaintiff submitted new medical evidence in support of his request for review (Tr. 7-45). The Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-5).

CONCLUSIONS OF LAW

Standard of Review

Review by the Court is limited to determining whether the findings set forth in the final decision of the Commissioner are supported by "substantial evidence," 42 U.S.C. § 405(g); Cotton v. Sullivan, 2 F.3d 692, 695 (6th Cir. 1993); Wyatt v. Sec'y of Health & Human Servs., 974 F.2d 680, 683 (6th Cir. 1992), and whether the correct legal standards were applied. Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence exists when

a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way." Cotton, 2 F.3d at 695 (quoting Casey v. Sec'y of Health & Human Servs., 987 F.2d 1230, 1233 (6th Cir. 1993)). In reviewing a case for substantial evidence, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." Cohen v. Sec'y of Health & Human Servs., 964 F.2d 524, 528 (6th Cir. 1992) (quoting Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984)).

As previously mentioned, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-5). At that point, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.955(b), 404.981, 422.210(a); see 42 U.S.C. § 405(h) (finality of the Commissioner's decision). Thus, the Court will be reviewing the decision of the ALJ, not the Appeals Council, and the evidence that was in the administrative record when the ALJ rendered the decision. 42 U.S.C. § 405(g); 20 C.F.R. § 404.981; Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996); Cotton v. Sullivan, 2 F.3d 692, 695-696 (6th Cir. 1993).

The Commissioner's Sequential Evaluation Process

The Social Security Act authorizes payment of Disability Insurance Benefits and Supplemental Security Income to persons with disabilities. 42 U.S.C. §§ 401 et seq. (Title II Disability Insurance Benefits), 1381 et seq. (Title XVI Supplemental Security Income). The term "disability" is defined as an

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.

42 U.S.C. §§ 423(d)(1)(A) (Title II), 1382c(a)(3)(A) (Title XVI); 20 C.F.R. §§ 404.1505(a), 416.905(a); Barnhart v. Walton, 535 U.S. 212, 214 (2002); Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990).

The Commissioner has promulgated regulations setting forth a five-step sequential evaluation process for evaluating a disability claim. See "Evaluation of disability in general," 20 C.F.R. §§ 404.1520, 416.920. In summary, the evaluation proceeds as follows:

1) Is the claimant engaged in substantial gainful activity?

2) Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement and significantly limits his or her ability to do basic work activities?

3) Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within Appendix 1?

4) Does the claimant have the residual functional capacity to return to his or her past relevant work?

5) Does the claimant's residual functional capacity, age, education, and past work experience allow him or her to perform a significant number of jobs in the national economy?

Here, the ALJ denied Plaintiff's claim at the fifth step. The ALJ found that Plaintiff has not been disabled from May 13, 2014 through July 1, 2015, because he retains sufficient residual functional capacity to perform jobs that exist in significant numbers in the national economy.

A

1. Plaintiff's Argument

Plaintiff challenges Finding No. 2 because the medical evidence shows a complete tear of his right knee anterior cruciate ligament ("ACL"), yet the ALJ failed to find this condition is a

5

"severe" impairment within the meaning of the regulations (DN 15 PageID # 627). Plaintiff indicates that an MRI of his right knee on May 10, 2014, revealed the complete tear of the ACL, a suspected tear of the fibular collateral ligament ("FCL"), and meniscal tears (Id. citing Tr. 400-01). Plaintiff points out the operative report shows there was no attempt to repair the ACL tear during the right knee arthroscopic surgery on September 26, 2014 (Id. citing Tr. 508-09). Plaintiff also points out it was later reported that he was in need of a total knee replacement (Id. citing Tr. 460), but the surgery was contraindicated due to risks associated with the diagnosis of cardiomyopathy (Id. citing Tr. 429).

Plaintiff contends the ALJ failed to discuss the knee findings in detail with regard to Plaintiff's severe impairments (Id.). Plaintiff asserts that this ligament tear would impose additional limitations not covered by his degenerative knee conditions (Id.). Plaintiff argues that his ACL tear should be considered a severe impairment (Id.).

2. Defendant's Argument

Defendant argues that substantial evidence supports the ALJ's finding that Plaintiff's ACL tear was not a severe impairment (DN 18 PageID #643-44). Defendant contends the ALJ considered evidence regarding the ACL tear and Plaintiff's subsequent surgery (Id. citing Tr. 58, 474, 508). Defendant points out the ALJ noted that following the surgery, Plaintiff had full knee strength in flexion and extension, and his range of motion testing was near normal limits (Id. citing Tr. 58, 460). Additionally, Defendant points out that by April 2015, an examination revealed no objective abnormalities (Id. citing Tr. 510-14). Alternatively, Defendant relies on Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987), to argue the ALJ's failure to find this impairment "severe" was harmless (Id.).

3. Discussion

At the second step in the sequential evaluation process, a claimant must demonstrate he has a "severe" physical or mental impairment to continue with the remaining steps in the disability determination. 20 C.F.R. §416.920(a)(4)(ii); Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988) (*per curiam*). An impairment is "severe" if it's significantly limits a claimant's ability to do basic work activities. 20 C.F.R. § 416.920(a)(4)(ii) and (c); Social Security Ruling 96-3p; Social Security Ruling 96-4p; Higgs, 880 F.2d at 863. Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. § 416.921(b). An impairment will be considered non-severe only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." Farris v. Sec'y of Health & Human Servs., 773 F.2d 85, 90 (6th Cir. 1985) (citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)).

Plaintiff apparently injured his right knee on April 26, 2014 (Tr. 396). Plaintiff reported that he jumped out of a truck and, as he landed, his right leg gave out from underneath him and buckled (Id.). On April 29, 2014 Dr. Buchanan, an orthopedist, performed an examination, reviewed films of Plaintiff's right knee, and made the following assessment: localized primary osteoarthritis of the right knee, displaced acute medial meniscus tear of the right knee, knee sprain, and loose body in the knee (Tr. 398-99). Dr. Buchanan scheduled an MRI of the right knee with a follow-up office visit (Tr. 399).

The MRI was performed on May 10, 2014, and the radiologist's report sets forth the following diagnostic impression:

1. Complete tear of anterior cruciate ligament and redundant appearing, but otherwise intact posterior cruciate ligament.

2. Extensive bony edema throughout the tibial plateau, predominantly along the posterolateral aspect associated with what appears to be a small osteochondral impaction injury adjacent to the fibular head. Additional edema signal is seen in the lateral femoral condyle and in the medial femoral condyle, as well as in the fibular head.

3. The fibular head appearance reveals curvilinear defect which suggests a probable small fracture line, but without significant displacement.

4. Joint effusion.

5. Irregular tear of medial meniscus central to posterior horn aspects.

6. Cartilaginous thinning along the medial edges of the medial femoral condyle and medial tibial plateau. This may be due to degenerative change or impaction injury.

7. Lateral meniscus linear tear of posterior horn.

8. A full-thickness focal osteochondral defect along the medial facet of the posterior surface of the patella.

9. Joint effusion.

10. Soft tissue edema is seen about the knee, particularly laterally.

11. Fibular collateral ligament tear suspected.

(Tr. 400-01).

Plaintiff presented for a follow-up office visit with Dr. Buchanan on May 13, 2014 (Tr. 402-04). Following an examination of plaintiff and review of the MRI, Dr. Buchanan assessed displaced acute medial meniscus tear of the right, displaced acute lateral meniscus tear of the right knee, and complete tear of the ACL of the right knee (Tr. 404). Initially, Dr. Buchanan recommended physical therapy as well as pain management with hydrocodone-acetaminophen 10-325 mg, 1 to 2 tabs every 12 hours as needed for pain (Tr. 404). However, by June 10, 2014, Plaintiff advised Dr. Buchanan that the physical therapy had not helped and he was ready to have surgery on the right knee (Dr. 409, 426). Dr. Buchanan's surgical plan involved right knee diagnostic arthroscopy with partial medial and lateral meniscectomies and other procedures as indicated (Tr. 412, 428).

Plaintiff then sought surgery clearance from his cardiologist, Dr. Lin (Tr. 429). After conducting a two-dimensional transthoracic echocardiogram, Dr. Lynn declined to give general anesthesia surgery clearance apparently because Plaintiff had a left ventricle ejection fraction of 25%[1] (Tr. 429-440). Further, in lieu of an implantable cardioverter defibrillator, Dr. Lynn prescribed a lifevest which is a wearable defibrillator (Tr. 79-80, 440).

On August 26, 2014, Plaintiff met with Dr. Buchanan and advised that his cardiologist would not give him clearance for general anesthesia surgery (Tr. 441). As a result, Dr. Buchanan planned on spinal anesthesia while performing the right knee diagnostic arthroscopy with partial medial and lateral meniscectomies and other procedures as indicated (Tr. 444). The operative report indicates on September 26, 2014, Dr. Buchanan performed a right knee diagnostic

---

1 Notably, "[a] normal left ventricular ejection fraction (LVEF) ranges from 55% to 70%." http://my.clevelandclinic.org/health/articles/ejection-fraction. An LVEF of less than 35% means the pumping ability of the heart is severely below normal and "you have a greater risk of life-threatening irregular heartbeats that can cause sudden cardiac arrest/death." Id.

arthroscopy with partial medial and lateral meniscectomy and a resection of the medial plica (Tr. 508-09). Although the diagnostic arthroscopy confirmed the presence of an ACL tear, there is no indication in the operative report that Dr. Buchanan repaired the ligament (Tr. 509). Thus, following the arthroscopic surgery, Plaintiff continued to have the ACL tear in his right knee.

Following the surgery, plaintiff underwent physical therapy from September 26, 2014 through December 5, 2014 (Tr. 460-84). The physical therapy discharge summary noted that Plaintiff had shown progress through increased range of motion and increased strengthening (Tr. 460). The report indicated that Plaintiff's right knee flexion and extension was 5/5 and his passive range of motion was 52 to 126 degrees flexion (Dr. 460). However, the report indicates that Plaintiff's pain continued to be a "problem which, based on the status of his right knee joint, will probably remain a problem until undergoing total knee replacement as directed by Dr. Buchanan" (Id.).

From February 2, 2015 through April 29, 2015, Plaintiff received treatment for right knee pain from Comprehensive Pain Specialists (Tr. 525-29). A physical examination of the right knee on February 2, 2015, revealed crepitus with range of motion, chronic anterior swelling, and a positive drawer sign test[2], which indicates a torn ACL (Tr. 527). While Plaintiff's chronic pain became stable by April 29, 2015, he continued to experience an average pain score of 8 on a scale of 1 to 10 along with swelling, popping and aching (Tr. 510-11).

---

2  The drawer sign is a test used during a physical examination to determine whether a patient has laxity or a tear of the ACL or posterior cruciate ligament of the knee.   http://medical-dictionary.thefreedictionary.com/drawer+sign.

According to the Mayo Clinic website, "[l]igaments are strong bands of tissue that connect one bone to another. The ACL, one of two ligaments that cross in the middle of the knee, connects your thigh bone (femur) to your shinbone (tibia) and help stabilize your knee joint."[3] According to the Miami Sports Medicine website, "[t]he ACL is the main knee stabilizer, preventing excessive motion at the knee joint between the femur (thigh bone) and the tibia (leg bone)."[4] The signs and symptoms of an ACL injury can include "[a] loud 'pop' or a 'popping' sensation in the knee", "[s]evere pain and inability to continue activity", and "[a] feeling of instability or 'giving way' with weight-bearing".[5] If the symptoms of knee instability are not controlled by a brace and rehabilitation program, then arthroscopic surgery using a piece of tendon to replace the torn ACL may be suggested.[6]

The medical evidence in the administrative record and the medical literature set forth above indicate that Plaintiff's ACL tear would, necessarily, impose some type of limitations on his ability to perform basic work activities. Yet, at the second step in the sequential evaluation process, the ALJ did not find Plaintiff's ACL tear to be a "severe" impairment within the meaning of the regulations (Tr. 55). Further, the ALJ did not indicate why he believed the ACL tear was a nonsevere impairment (Tr. 55-56).

Although substantial evidence may not support the ALJ's finding that the ACL tear is a "nonsevere" impairment, that error is insufficient, alone, to reverse and remand the ALJs decision. See Maziarz, 837 F.2d at 244. So long as an Administrative Law Judge finds that other

---

3 http://www.mayoclinic.org/diseases-conditions/acl-injury/symptoms-causes/dxc-20167379

4 http://www.miamisportsmedicine.com/ACLTears.html

5 http://www.mayoclinic.org/diseases-conditions/acl-injury/symptoms-causes/dxc-20167379

6 http://www.miamisportsmedicine.com/ACLTears.html

impairments are severe, continues on with the sequential evaluation process, and considers all of a claimant's impairments in the remaining steps, the error is harmless. Id.; Mish v. Comm'r of Soc. Sec., No. 1:09-CV-753, 2011 WL 836750, at *1-2 (W.D. Mich. Mar. 4, 2011); Stephens v. Astrue, No. 09-55-JBC, 2010 WL 1368891, at *2 (E.D. Ky. Mar. 31, 2010); Meadows v. Comm'r of Soc. Sec., No. 1:07cv1010, 2008 WL 4911243, at *12-13 (S.D. Ohio Nov.13, 2008); Jamison v. Comm'r of Soc. Sec., No. 1:07-CV-152, 2008 WL 2795740, at *8-9 (S.D. Ohio July 18, 2008); Tuck v. Astrue, No. 1:07-CV-00084-EHJ, 2008 WL 474411, at *3 (W.D. Ky. Feb. 19, 2008). Here, the ALJ found that Plaintiff had other impairments that are "severe," and continued with the sequential evaluation process. Thus, the undersigned must determine whether the ALJ considered Plaintiff's ACL tear in the remaining steps in the sequential evaluation process.

At the fourth step, in the context of making the residual functional capacity assessment, the ALJ discussed Plaintiff's ACL tear and the arthroscopic surgery (Tr. 58). However, the ALJ failed to recognize that Dr. Buchanan did not repair the ACL tear during the arthroscopic surgery (Tr. 58). Further, the ALJ provided a less than accurate and thorough summary of the physical therapy and pain management medical records with regard to the ACL tear (Tr. 58). More importantly, the ALJ's residual functional capacity assessment and hypothetical questions to the vocational expert failed to take into consideration limitations that may have been imposed by the ACL tear in Plaintiff's right knee (Tr. 57, 91-93). Therefore, the ALJ's failure to address or include any limitations from the ACL tear in determining Plaintiff's residual functional capacity is not harmless error, so this case will be reversed and remanded, pursuant to sentence four of 42

U.S.C. § 405(g), for further development and clarification of Plaintiff's knee impairment on his ability to do work. See <u>Mish</u>, 2011 WL 836750, at 2; <u>Meadows,</u> 2008 WL 4911243, at *13.

The undersigned acknowledges that Plaintiff has raised other challenges to the ALJ's findings. The undersigned concludes it is not necessary to address those challenges in light of the above findings. Notwithstanding, the ALJ completely overlooked Dr. Lin's determination that Plaintiff has a left ventricle ejection fraction of 25% and the significant impact it may have on Plaintiff's residual functional capacity (Tr. 58, 429-40). This is a matter that should be addressed by the ALJ upon remand.

<u>ORDER</u>

**IT IS HEREBY ORDERED** that the final judgment of the Commissioner is **REVERSED.**

**IT IS FURTHER ORDERED** that the case is **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further proceedings consistent with the instant Memorandum, Opinion, and Order.

This is a final and appealable Order and there is no just cause for delay.

Copies:    Counsel